IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alicia R. Monge, | ) No. CV 04-538-TUC-RCC (HCE) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| vs. | ) |
| Michael J. Astrue,[1] Commissioner of Social Security, | ) |
| Defendant. | ) |

On October 8, 2004, Plaintiff filed the instant *pro se* action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). On that same date, Plaintiff's case was referred to Magistrate Judge Nancy Fiora for a Report & Recommendation pursuant to the Rules of Practice of this Court. Thereafter, the case was referred to the undersigned Magistrate Judge in light of Magistrate Judge Fiora's retirement.

Pending before the Court are Plaintiff's Motion to Submit New Evidence, Plaintiff's Motion for Summary Judgment (hereinafter "Plaintiff's MSJ") and Defendant's Cross-Motion for Summary Judgment (hereinafter "Defendant's XMSJ"). For the following reasons, the Magistrate Judge recommends that the District Court deny Plaintiff's Motion to Submit New Evidence, grant Plaintiff's Motion for Summary Judgment, and deny Defendant's Cross-Motion for Summary Judgment.

---

[1]On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as the defendant in this action.

I.      PROCEDURAL HISTORY

On September 21, 2001, Plaintiff submitted to the Social Security Administration (hereinafter "SSA") an application for supplemental security income under Title XVI of the Social Security Act alleging inability to work since August 15, 2001 due to "traumatic arthritis" of the right knee and allergy to polyester. (TR. 142-145, 163) Plaintiff's application was denied initially and on reconsideration. (TR. 69, 74, 76-79)

Plaintiff then requested a hearing before an administrative law judge (hereinafter "ALJ") and the matter was heard on September 9, 2002 by ALJ Norman R. Buls who denied Plaintiff's claim. (TR. 57-68, 80, 286-299) The Appeals Council granted Plaintiff's request for review and remanded the matter to the ALJ for further proceedings. (TR. 90, 130-132, 136-140) On remand, a hearing was held on June 30, 2003 wherein Plaintiff,[2] who was unrepresented by counsel, and a vocational expert testified. (TR. 257-285) At the hearing, the ALJ indicated that he was going to refer Plaintiff for an orthopaedic consultative examination. (TR. 283) On February 13, 2004, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (TR. 24-29)

Plaintiff requested that the Appeals Council review the ALJ's decision. (TR.13) The Appeals Council, after considering additional evidence submitted by Plaintiff, denied Plaintiff's request for review thereby rendering the ALJ's February 13, 2004 decision the final decision of the Commissioner. (TR. 7-12) Plaintiff then initiated the instant action.

II.      THE RECORD ON APPEAL

A.      Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on February 28, 1950. (TR. 142) Plaintiff is married. (TR. 291) At the time of the September 9, 2002 hearing, she lived in a trailer with her husband, one minor child, and three grown children. (Id.)

_____

[2]Plaintiff, who does not speak English, testified through an interpreter.

Plaintiff completed school through the sixth grade in Mexico.  (TR. 262) She cannot read, write, or speak English.  (Id., TR. 291) Plaintiff's work history includes employment as a string cutter at a hydroponic nursery in 2001, a hydroponic nursery farmhand picking tomatoes from December 1999 through 2001, a chili sorter/cutter from August 1999 through November 1999 and August 1995 through November 1997, and a produce canner in August 1995 through November 1997.  (TR. 181; *see also* TR. 264-266) Plaintiff sustained a right knee injury while working as a nursery farmhand picking tomatoes  in June 2000.  (TR. 163, 264-265) Plaintiff's previous work as a produce picker involved lifting from 25 to 50 pounds. (TR. 164, 184)

As a produce picker, Plaintiff worked at a hydroponic nursery.  (TR. 275) Her duties involved pushing a cart, picking tomatoes and placing them in boxes.  (TR. 275-276) She was required to place 15 pounds of tomatoes per box in 50 boxes on her cart.  (Id.)  She filled six carts per day.  (Id.)  This work involved lifting from 25 to 50 pounds.  (TR. 164, 184) As a green chili sorter, she worked at a conveyor belt "grabbing the chili in handfuls" and cutting them. (TR. 280, 282) She had to move around and watch to make sure that the conveyor belt did not grab her apron.  (TR. 283)

After the injury, Plaintiff worked as a string cutter at the nursery where she previously worked as a farmhand.  (TR. 267, 269-270) That job was usually reserved for workers who were awaiting the arrival of tomatoes, at rest, or had been injured.  (TR. 268)  Plaintiff's work as a string cutter involved remaining in a seated position while cutting polyester string and making bows to tie on produce boxes.  (TR. 268, 270-271) She performed such work seated in the sun, surrounded by prisoners and near the loading vehicles which emitted exhaust fumes that would "come against my face and my nostrils."  (TR. 269-271, 295) She developed a sore, swollen throat, an allergy to the polyester strings she was cutting, swelling in her knee and leg, and she did not want to be located near the prisoners.  (TR. 270-271)

Plaintiff testified that she wore latex gloves when working with the strings.  (TR. 270) When the ALJ asked how she determined she was allergic to polyester if the latex gloves prevented her hands from coming into contact with the strings, Plaintiff answered:

> the thread...breaks off [sic] little pieces from it.  Because I mean you're measuring it...you're cutting it and you're winding it around your fingers like that.  I had a lot of problems working that, that I didn't mention.  When I was sitting...over there, the loaders would come by, that was a problem, I was seated there, they'd have me move.  I had a lot of problems with my throat, and then it's what the fumes coming off the loaders.  And in the mornings, they'd move us.

(TR. 270-271) When asked how the polyester affected her, Plaintiff responded that she felt hot and cold and could not breathe due to swelling in her throat.  (Id.)  Plaintiff did not go to an allergist because insurance coverage was declined.  (TR. 271-272)

Plaintiff stopped working because she "was fired" for objecting "to allergic material handling, unburnt gases emanations from exhausts, and blood circulation impairment, fluid retention due to sedentary work."[3]  (TR. 163) She is unable to work because her leg "is hurting a lot, and it swells...I can't be actively walking, or doing things very fast, or lifting up heavy things."  (TR. 294) Additionally, constant pain keeps her from being able to sit or

---

[3]In May 2001, Plaintiff complained to management regarding her polyester allergy and was instructed to continue wearing latex gloves. (TR. 200) At some point, she also complained to management about fumes from the loading vehicles and requested that she be relocated away from the fumes.  (TR. 271) On August 14, 2002, Plaintiff received a "Final Warning for Insubordination and Disruptive Behavior" (hereinafter "Warning") regarding Plaintiff's alleged behavior when her work station was moved. (TR. 201) The Warning also indicated that Plaintiff had been provided with a filter mask when she complained about dust. (Id.) On that same date, Plaintiff was terminated for "insubordinate behavior [sic] your manager." (TR. 203) On August 15, 2001, Plaintiff sent a letter to her employer expressing her side of the events that resulted in her termination noting that she was the "victim of the high turn-over of personnel...", describing the conditions where she was working including exhaust fumes and the need to frequently move location, and requesting that her employer "retract; rehabilitate me and send me back to my post or other better, and compensate accordingly and pecuniarily...."  (TR. 204-205)

stand for long periods.  (TR. 295) When she is standing, she must use a cane otherwise she feels as if she will fall.  (Id.)

Plaintiff stated that she experiences a constant pain in her knee that "varies from dull to stabbing...depending on the movement and shifting."  (TR. 175) She also experiences sharp pain in her knee and down her leg to the ankle when she does not step carefully or lifts her foot too quickly.  (Id.)

At home, Plaintiff used to do all the housework before her injury. (TR. 177) Now, she must alternate "every few minutes" between chores and rest because of pain and fluid on her knee.  (Id.)  She no longer goes shopping, but instead will stay in the car while her husband goes into the store because "store alleys are generally too long, carts [sic] difficult to maneuver with the frame or stick [i.e., walker or cane] and parking spaces are too far."  (TR. 178, 296-297) Plaintiff has a driver's license and is able to drive although she avoids driving except for short distances or emergencies.  (TR. 179, 292) She testified that she could have driven herself to the September 9, 2002 hearing.  (TR. 292)

On a typical day, Plaintiff rises at 8:00 a.m., cleans the kitchen and goes out to the patio to sit for a while.  (TR. 295-296) She uses a walker or a cane.  (Id.)  She also cooks meals during the day with assistance from her family and does laundry.  (TR. 296-297) She only visits with neighbors sporadically "over the fence" and sometimes distant relatives come to visit.  (TR. 178) Her hobbies include at-home study of English and citizenship.  (TR. 179) Her injury has reduced her activities.  (Id.)

B.     Vocational Expert Testimony

Vocational expert Kathleen McAlpine testified at the June 30, 2003 hearing.  She testified that a harvest worker for vegetables is considered medium work; she was not aware of any deviation from that classification for workers in hydroponic nurseries; Plaintiff's work as a chili sorter is considered past relevant work; Plaintiff's work as a chili sorter is classified as "light and unskilled"; and Plaintiff's work as a string cutter is similar to work as a hand packager which is considered sedentary.  (TR. 274-275, 279, 281-282)

C.    Medical Evidence

1.    Plaintiff's Treating Physicians

On June 14, 2000 Plaintiff reported to Jeffery B. Bushman, D.O., that she injured her leg the previous week at work.  (TR. 214) X-rays of the knee "show[ed] a little tiny bit of spurring medially and a slight decrease in the intra-articular space medially."  (Id.; *see also* TR. 215 (X-Ray report))  On examination, there was no evidence of meniscus injury and ligaments seemed intact.  (TR. 214)  "The pain seems to be coming from the fibular head area, maybe the perineal nerve."  (Id.)  He prescribed Vioxx and planned to see Plaintiff the following week to determine whether an orthopaedic consult was necessary.  (Id.)  Dr. Bushman subsequently referred Plaintiff to Jose Padilla, M.D., of Cochise Orthopaedic Clinic.  (TR. 210, 230)

On August 8, 2000, Dr. Padilla diagnosed right "knee internal deraingement." (TR. 210)  He scheduled surgery.  (Id.)  He also limited Plaintiff to standing up to six hours maximum, driving up to three hours maximum, occasionally bending and twisting her body, and no walking, squatting, climbing, or using feet to operate controls.  (Id.)  Such limitations were to stay in effect for four weeks. (Id.; *see also* TR. 211 (Dr. Padilla on August 8, 2000 indicating light duty, sitting or standing but no walking for the following four weeks))

On October 6, 2000, Dr. Padilla ordered Plaintiff off work for four weeks in light of arthroscopic debridement performed that day.  (TR. 216; *see also* TR. 219) During the procedure, it was noted that Plaintiff had moderate osteoarthritis involving the lateral femoral condyle and medial femoral condyle, there was no evidence of acute tears of the meniscus, and there was a questionable partial tear of the anterior cruciate ligament.  (TR. 219; *see also* TR. 254 ("when we carried out the arthroscopy...we encountered...degenerative meniscus tear and osteoarthritis."))  On October 13, 2000, Dr. Padilla ordered Plaintiff off work for two months.  (TR. 230) In November 2000, Dr. Padilla recommended a cane and partial weight bearing.  (*See* TR. 219-220) On December 8, 2000, Dr. Padilla continued Plaintiff off work for four weeks and prescribed physical therapy for rehabilitation of Plaintiff's right knee.

(TR. 228-229) On January 12, 2001, Dr. Padilla continued Plaintiff off work for two weeks, injected cortisone into her knee, directed her to continue physical therapy for four weeks and recommended a knee immobilizer at night because Plaintiff was developing a flexion contracture.  (TR. 226-227, 219-220)

On January 26, 2001, Dr. Padilla indicated that Plaintiff could return to light duty work four hours per day for the following four weeks.  (TR. 225) By February 23, 2001, Plaintiff was released to eight hours per day with directions to avoid ladders and minimize squatting.  (TR. 224)

On April 6, 2001, Dr. Padilla indicated that Plaintiff was totally incapacitated and directed that she remain off work for four weeks.  (TR. 232) However, on April 12, 2001, he found that Plaintiff could return to "sedentary work only" beginning April 16, 2001.  (TR. 233)

On May 9, 2001, Plaintiff presented at Arizona Family Associates, Inc., on direction of her employer due to her complaints of polyester allergy.  (TR. 218) "She has been working with polyester for some time now, and recently she is complaining of being allergic to the polyester...she has been using gloves to protect her hands which are the only parts of her body that touch the polyester."  (Id.)  Her symptoms included itching and rash.  (Id.)  The assessment was possible allergy to polyester.  (Id.)  She was prescribed benadryl, directed to continue use of "[l]atex gloves", and referred to an allergist.  (Id.)  She received a note recommending that her work area be modified to avoid contact with polyester and dust until she saw an allergist.  (TR. 217)

On September 4, 2001, Plaintiff saw Anthony Arnold, M.D.[4]  (TR. 222)  She complained of pain.  (Id.) Dr. Arnold noted Dr. Padilla's findings on arthroscopic treatment that Plaintiff had "traumatic changes...in the articular cartilage and the retropatellar and

---

[4]Plaintiff testified that she saw Dr. Arnold instead of Dr. Padilla for insurance coverage reasons.  (TR. 272)

femoral condyle areas.  The areas were debrided and some attempt was made to create new cartilage.  This has clinically been unsuccessful since she is still having pain to a significant degree." (Id.)  Radiographs showed mild degenerative changes.  (Id.; *see also* TR. 223)  On examination, Dr. Arnold denoted that Plaintiff was mildly overweight, her knee ligaments were stable, there was no patellofemoral pain, and there was tenderness along the medial joint line and the medial collateral ligament.  (TR. 222)  His assessment was traumatic arthritis of the right knee.  (Id.)  He advised Plaintiff "that although the x-rays are normal this does not mean that the knee is normal.  The changes described on the arthroscopic examination shows that significant cartilage damage on the articular cartilage has occurred." (Id.)  He opined that Plaintiff would ultimately require a total knee replacement when the wear process continues and that such procedure "should be performed only if all conservative partial weight bearing, ice packing and physical therapy modalities have been exhausted." (Id.)

On March 29, 2004, Plaintiff saw Dr. Padilla "for reevaluation of her knee trouble." (TR. 254)  When Dr. Padilla asked Plaintiff "what it is she would like me to do she tells me she wants me to find her disabled because she can't return to work." (Id.)  He agreed "with her that sometimes arthritis which could be quiescent can become a very active problem following trauma.  She therefore had an exacerbation of an underlying osteoarthritic picture." (Id.)  Plaintiff did not want to discuss how to treat her knee, "[s]he wants to know what my feeling is about her knee and I have explained that she should be retrained to carry out a light, sedentary type job as I doubt she will ever return to working in the fields in produce." (Id.)

       2.     State-Agency Physician

          a.     Examining Physicians

On May 21, 2001, Felix R. Jabczenski, Jr., M.D. of Orthopaedic Specialists of Arizona, examined Plaintiff who complained of persistent knee pain.  (TR. 219-221)  She reported that she could not walk long distances and was limited in her activities.  (TR. 220)

She stated that she took naprosyn occasionally for pain.  (Id.)  On physical examination Plaintiff exhibited diffuse anteromedial joint line tenderness but no specific crepitus, no evidence of atrophy, "no instability to varus valgus stresses or to anterior posterior drawer," and she had full flexion and extension of the knee joint.  (Id.)  X-rays showed moderate degenerative arthrosis, predominantly in the medial compartment of the right knee.  (Id.)  Dr. Jabczenski's diagnoses was (1) right knee degenerative arthrosis, not related to her industrial injury; and (2) right knee contusion, related to industrial injury.  (Id.)   He opined that "[d]espite the patient's continued subjective complaints of knee pain there are no objective findings  other than the arthritis which would describe her persistent symptoms."  (TR. 220-221) Dr. Jabczenski further opined that Plaintiff could perform light work with no squatting, lifting, or climbing ladders.  (TR. 221)  He noted that arthritic problems in her knee preclude heavy or strenuous work activities.  (Id.)  He also anticipated that Plaintiff's knee arthritis would progress in the future and might require further treatment. (Id.)

On July 25, 2003, Plaintiff saw William C. McCormick, D.O., who is a partner of Dr. Padilla's at the Cochise Orthopaedic Clinic.  (TR. 242) Plaintiff complained of knee pain and discomfort and that "she is unable to squat, climb ladders, repetitively climb stairs, etc." (Id.) She reported using naprosyn for pain.  (TR. 243) Dr. McCormick found on examination that Plaintiff had limited, painful range of motion of her knee, lacks the last 15 degrees from full extension, and "[s]he has no gross instability but has a mild synovitis and an effusion that she says is there most of the time."  (TR. 242) Dr. McCormick completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) indicating that Plaintiff could occasionally and frequently lift up to 10 pounds; stand and/or walk less than 2 hours in an 8-hour workday; sit for an unrestricted amount of time but must periodically alternate between sitting and standing to relieve pain; occasionally balance, kneel, and stoop but could never climb, crawl, or crouch.  (TR. 244-246) He did not recommend environmental limitations.  (TR. 247) He concluded that Plaintiff could not return to the fields.  (TR. 243) "The only work that she could possibly do would be light sedentary office work...In regard

to her future, there is little question that she has significant degenerative changes of her right knee on x-ray.  The joint spaces are, however, still preserved. "  (Id.)  Although Plaintiff would most likely require total knee replacement in the future, he recommended that the procedure be postponed as long as possible.  (Id.)

On November 19, 2003, Genifer Y. Chavez, M.D., examined Plaintiff at the behest of the ALJ.  (TR. 248-251)    Plaintiff complained of constant pain, difficulty sleeping, difficulty walking, and lack of balance.  (TR. 250) "She always has to use a cane." (TR. 248) She also complained of an allergy to polyester which caused a rash.  (Id.)  Plaintiff indicated that "[s]he is able to do things, however, only much slower."  (Id.)  Plaintiff reported using naprosyn for pain.  (TR. 249) On physical examination, Plaintiff was unable to heel or toe walk, tandem walk, hop or squat; she had decreased right knee extension; loss of hollows around the patella; experienced pain with valgus and varus testing and compression of the patella; experienced tenderness anterolateral and anteromedial joint line; and experienced pain with compression of patella.  (TR. 250) Dr. Chavez opined that Plaintiff

> may tolerate sitting two to four hours at a time, aggregate six hours in an eight-hour day.  She may stand and walk one to two hours at a time, aggregate four hours in an eight-hour day.  She has no limitations to use of upper extremities, hearing, and speaking.  She reportedly does not drive and may travel two to four hours at a time.

(TR. 250-251)

### b.    Non-examining Physician

On November 2, 2001, a medical consultant whose name is illegible but whose initials are JLD (hereinafter "JLD") completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (TR. 235-241) He opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight hour workday; sit about six hours in an eight hour workday; and frequently balance and stoop.  (Id)  He also concluded that due to Plaintiff's degenerative arthritis of the right knee, she was limited in pushing and pulling with her lower extremities and could only occasionally climb, kneel, crouch, or crawl.

(TR. 235-236) He also found that Plaintiff should "avoid even moderate exposure...due to polyester due to allergy." (TR. 238) He indicated that Plaintiff was partially credible. (TR. 241)

      D.     The ALJ's Findings

          1.     Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled under the Act and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c)), 416.920(c)). In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities. *Id.* If the ALJ concludes that the impairment is not severe, the claim is denied. *Id.* If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary. If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step. The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional

capacity ("RFC")[5] to perform past work.   20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.   *Id.* However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.   20 CFR §§ 404.1520(f). 416.920(f).   At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.   *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).   The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.   *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).   However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.   *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.   *Desrosiers,* 846 F.2d at 580.

### 2.    The ALJ's Decision

In his November 26, 2002 decision, the ALJ found that Plaintiff's "mild arthritis in the knees is a severe impairment", Plaintiff had the residual functional capacity to perform light work, and she could return to her past work as an agricultural produce sorter which did not require performance of work-related activities precluded by her residual functional capacity.  (TR. 67)

Thereafter, the Appeals Council remanded the matter for resolution of the following issues: whether Plaintiff's past relevant work as an agricultural produce sorter, which is seasonal work, was performed for a sufficient duration to constitute substantial gainful

---

[5]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545, 20 CFR 416§945.

activity and to allow for Plaintiff to acquire the facility needed for average performance of the job; and whether Plaintiff's past work as a farm hand for a nursery is consistent with Plaintiff's residual functional capacity given that the *Dictionary of Occupational Titles* (hereinafter "DOT") describes "general farm worker II" as "heavy work" and given that Plaintiff was assigned to string cutting for a period.  (TR. 137) The Appeals counsel also pointed out that the ALJ did not address non-examining physician JLD's opinion that Plaintiff had a polyester allergy and polyester related limitations.  (Id.)  Thus, the matter was also remanded for the ALJ to obtain updated medical records including allergy related records and to "[g]ive consideration to the non[-]examining source opinion pursuant to provisions of 20 CFR [sic] 416.927(f) and Social Security Ruling 96-6p, and explain the weight given such opinion evidence."  (TR. 138) The Appeals Council dismissed Plaintiff's contentions concerning bias by the ALJ.  (Id.)

In his February 13, 2004 decision issued after remand and re-hearing, the ALJ made the following findings:

1.    The claimant has not performed substantial gainful activity since September 7, 2001.

2.    The medical evidence establishes that the claimant has these severe, medically determinable impairments: status post arthroscopic surgery of the right knee; right knee arthritis; history of an allergy to polyester; and obesity (196 pounds, 5' 1½").

3.    Claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 CFR [sic] 404, Appendix 1, Subpart P.

4.    The claimant has an underlying medically determinable impairment that could possibly cause some pain or other symptoms, but claimant's allegations with regard to the severity and functional consequences of the symptoms are not fully credible (SSR 96-7p).

5.    The claimant has the residual functional capacity to perform sedentary work (20 CFR [sic] 416.945).  Claimant has the ability to lift/carry ten pounds occasionally, up to ten pounds frequently, stand and/or walk at least two hours with breaks during an eight hour workday, and sit continuously with breaks

every two hours for about six hours in an eight hour workday
with no climbing of ladders.

6.      The claimant's impairments do not preclude performance of her
        past relevant work as chili sorter/string cutter.

7.      The claimant was not under a "disability," as defined in the
        Social Security Act, at any time through the date of this decision
        (20 [sic] 416.920(e)).

DECISION

It is the decision of the Administrative Law Judge that, based on the
application filed effective September 7, 2001, the claimant is not entitled to
supplemental security income under sections 1602 and 1614(a)(3)(A) of the
Act.

(TR. 28-29)

In reaching his decision, the ALJ accorded substantial persuasive weight to Plaintiff's

treating and examining physicians.  (TR. 27) He gave substantial weight to the opinions of

the non-examining physicians "to the extent supported by and consistent with the evidence

of the entire record...."  (Id.)

Additionally, the ALJ found that Plaintiff's allegations concerning the severity and

functional consequences of her symptoms were not fully credible.  (TR. 26-27)

III.    PLAINTIFF'S MOTION TO SUBMIT NEW EVIDENCE

Plaintiff seeks to submit medical records from 2005 and other information.

(Plaintiff's Motion to Submit New Evidence) Specifically, Plaintiff has submitted a July 21,

2005 letter from Jose Romo, M.D., stating that Plaintiff was diagnosed with breast cancer

and underwent surgery in 2005, and 2006 mammogram results indicating that Plaintiff

required further evaluation. (Id. at Ex. 2, 3; *see also* Id. at Ex. 7 (indicating that Plaintiff

learned about her breast cancer in 2005))  She also seeks to submit portions of a December

15, 2005 report from Jerome Rothbaum, M.D., indicating that upon physical examination

Plaintiff demonstrated:

hypertrophic changes around both knees, more so on the right than on the
left...She is mildly to moderately tender over the medial joint line of the right
knee as well as over the lateral joint line, not over the patella.  There is no
evidence of inflammation.  No instability.  No obvious atrophy noted.  There

> is moderate to marked crepitation involving the right knee...She heel and toe walks adequately.  She squats approximately 50% of normal distance primarily complaining of pain in her right knee.  She walks with a mild antalgic gait, limping on her right leg and she maintains the right leg in a somewhat abducted position as she walks.

(Id. at Ex. 1) Dr. Rothbaum's impression was (1) degenerative joint disease, knees, right greater than left; (2) intraductal carcinoma of the left breast, status post lumpectomy with chemotherapy; and (3) status post umbilical herniorrhaphy.  (Id.)

Plaintiff also submits: (1) the last page of an undated letter sent by the Social Security Administration regarding information about employment networks[6] (Id. at Ex. 4); (2) an April 15, 2004 letter she sent to the Appeals Council which is in the record at TR. 252-253 (Id. at Ex. 5); (3) a June 14, 2005 letter from the United States Department of Justice Civil Rights Division regarding allegations Plaintiff made under the American with Disabilities Act (Id. at Ex. 6); (4) Plaintiff's and Reyes J. Monge's July 28, 2006 statement that they are now caring for their grandchild while the child's mother, their daughter, serves in the U.S. military  (Id. at Ex 7); (5) a Social Security Legislative Bulletin regarding eligibility of individuals who were ineligible for supplemental security income "because of their spouses or parent(s) being called to active military duty...." (Id. at Ex. 8); and (6) a November 2004 state court non- appearance review continuing guardianship of Plaintiff's grandchild (Id. at Ex. 9) Plaintiff also states that she was approved for "SS suplementary [sic] income for $498.00 monthly in June 2005, and continuance of this monthly stipend conditioned to [sic] the results of a medical examination supposed to take place...September, 2006." (Plaintiff's Motion to Submit New Evidence, p.1) The context of Plaintiff's Motion suggests that she is receiving the stipend either in whole or in part as a result of her breast cancer diagnosis and treatment.   Plaintiff argues that "the changes found by Dr. Rothbaum in the old knee

---

[6]Plaintiff contends that this notice "proposed as an alternative to another determination or pre-suspension medical exam, are both [sic] unrealistic,..." (Plaintiff's Motion to Submit New Evidence, p.5)

problem...might have helped her...qualify for SSI besides the new surgery..." (Id. at p.2) She also states that

> the cancer incident...and its incapacitating chemotherapy sequel, followed by the approval of SSI to help deal with same, implicitly resolves part of this old claim, for the fact that the formerly injured knee becoming markedly affected by chemotherapy suggests that the importance of this knee condition in question was underestimated all the time by physicians, officials and the ALJ.

(Id. at p.3) Plaintiff also asserts out that "an additional dash of sympathy to this case applies" because she is the legal guardian of her grandchild whose mother is serving in the armed forces.  (Id. at p.6)

The Court may remand a case to the Commissioner for consideration of new evidence when the plaintiff demonstrates that there is: (1) new evidence that is material; and (2) good cause exists for her failure to incorporate that evidence into the administrative record. *Sanchez v. Secretary,* 812 F.2d 509, 511 (9th Cir. 1987) (*citing Allen v. Secretary,* 726 F.2d 1470, 1472 (9th Cir. 1984)); 42 U.S.C. §§ 405(g), 416(i)(2)(G)). Defendant contends Plaintiff's proffered evidence is not material.  (Defendant's Opposition, p. 1))  To satisfy the materiality requirement, Plaintiff must show "that the new evidence is material to and probative of [her] condition as it existed at the relevant time –at or before the disability hearing." *Sanchez,* 812 F.2d at 511 (*citing* 42 U.S.C. §416(i)(2)(G)).

Plaintiff's Motion is moot with regard to her April 15, 2004 letter to the Appeals Council given that the letter is already part of the administrative record.  (*See* TR. 252-253) Plaintiff's breast cancer was not discovered until 2005– after the final decision in this matter, and Dr. Rothbaum's 2005 report does not indicate an opinion as to whether Plaintiff's knee condition was disabling at or before the disability hearing.  *See Sanchez,* 812 F.2d at 511 (*citing* 42 U.S.C. § 416(i)(2)(G)) As to the other documents, Defendant is correct that Plaintiff has not shown that the new documents are probative of her condition as it existed at or before the disability hearing. *Id.*  Consequently, Plaintiff's Motion to Submit New Evidence should be denied.

- 16 -

IV.    CROSS-MOTIONS FOR SUMMARY JUDGMENT

    A.    Argument

Plaintiff argues that the ALJ improperly discredited Dr. McCormick's opinion in favor of Dr. Chavez's opinion even though Dr. Chavez did not have experience with the repetitive movements required of farm workers; the ALJ improperly discounted Plaintiff's pain testimony; and that her constitutional rights were violated during the claims process.

Defendant stresses that no treating physician indicated that Plaintiff was disabled. Instead, treating Dr. Padilla released Plaintiff to sedentary work which was consistent with the ALJ's finding. Defendant also points out that the ALJ properly noted that Plaintiff performed a fairly wide range of daily activities.  Defendant further argues that Plaintiff's "attack on the merits of the ALJ's decision is not sufficient to implicate a due process right to be heard."  (Defendant's XMSJ, p. 7 n. 4)

    B.    Standard of Review

An individual is entitled to Title XVI Supplemental Security Income disability benefits (hereinafter "SSI") if the individual meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ . 42 U.S.C. § 1381(a), 1382c(a)(3)(A).  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with

substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the

Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C.      DISCUSSION

1.    The RFC Determination

a.    Introduction

The ALJ's determination herein was made at step four of the disability determination process.   "At step four, claimants have the burden of showing that they can no longer perform their past relevant work."  *Pinto v. Massanari,* 249 F.3d 840, 844 (9th Cir. 2001) (*citing* 20 CFR §§ 404.1520(e), 416.920(e)).  Although the claimant has the burden of proof at step four, "the ALJ still has a duty to make the requisite factual findings to support his conclusion."  *Id. (citing* SSR 82-62)).

To deny disability benefits at step four, the ALJ must find that the claimant is able to perform either the actual functional demands and job duties of a particular past relevant job, or the functional demands and job duties of the occupation as generally required by employers throughout the national economy.  *Id.*  at 845 (*citing* SSR 82-61).  "This requires specific findings as to the claimant's residual functional capacity,  the physical and mental demands of the  past relevant work,  and the relation of the residual functional capacity to the past work", i.e., that the claimant's RFC would permit her to return to this past work.  *Id.* Further, when determining a claimant's RFC, the "ALJ must consider all relevant evidence in the record including, *inter alia,* medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable

impairment.'"  *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006) (*quoting* SSR

96-8p).

b.      Plaintiff's past work as a chili sorter

The ALJ's RFC determination is inconsistent with his own findings.  The ALJ found

that Plaintiff had the residual functional capacity to:

> perform sedentary[7] work....Claimant has the ability to lift/carry ten pounds
> occasionally, up to ten pounds frequently, stand and/or walk at least two hours
> with breaks during an eight hour workday, and sit continuously with breaks
> every two hours for about six hours in an eight hour workday with no climbing
> of ladders.

(TR. 28) He also found that such residual functional capacity did not preclude Plaintiff from

performing her past relevant work as a "chili sorter/string cutter."  (Id.)

Plaintiff worked as a chili sorter and chili cutter seasonally from August 1995 to

November 1997 and August 1999 to November 1999.  (TR. 181) Plaintiff described the

"chili sorting" (TR. 279) job as follows:

> [T]he chili is already in containers, and it goes down canals on some bands like
> this table wide, table width.  And it's just bands and air belts.  And you have
> boots on and you have bibs, and you have hats and you're cutting them.  And
> you'll be cutting them, grabbing them.  Grabbing the chili in handfuls, and
> putting it on the conveyer belt where they're going to cut it, it's a knife.
> ***
> [Y]ou grab the chili like this quickly, place in here in he [sic] cutter, the cutter
> cuts it, in eight centimeters it's called.  And then the conveyor belt is going
> along quickly, and there's the chili coming along here, and here's the knife,
> you throw it in there it's cutting it...you have to inspecting [sic] it there too, but
> it's a quick thing....I have an injury on my leg and knee, you got to have your
> arms, they got to be loose, and you got to be moving around.  You can't be
> stiff like this.  You got to be moving around, watching out, you know,
> watching out for the conveyor belt so it doesn't grab your apron.

(TR. 280, 282-283)

---

[7]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally
lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary
job is defined as one which involves sitting, a certain amount of walking and standing is
often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are
required occasionally and other sedentary criteria are met."  20 CFR § 416.967(a).

When the ALJ asked the vocational expert whether such work was "sedentary or...more" than sedentary, the vocational expert testified: "it's more light and unskilled."[8] (TR. 281) Despite the vocational expert's testimony, the ALJ found that Plaintiff's "past relevant work as chili sorter as described and actually performed by claimant was at the sedentary exertional level." (TR. 28)

The ALJ must make "the appropriate findings to insure that the claimant really can perform his or her past relevant work." *Pinto,* 249 F.3d at 845. Plaintiff's testimony concerning her past work as a chili sorter as actually performed does not specifically indicate whether she performed the job while seated or standing. The fact that she was required to wear boots and was in constant motion suggests that she was standing. More importantly, the ALJ gave no reason whatsoever for departing from the vocational expert's opinion that such work as described by Plaintiff was not sedentary but was "light."[9] (TR. 281) Nor did he explain how Plaintiff's description of such work resulted in a sedentary classification. Consequently, the substantial evidence of record does not support the ALJ's determination

---

[8]Defendant states that "the vocational expert testified that Plaintiff could perform her past relevant sedentary work." (Defendant's XMSJ, pp. 6-7 *citing* TR. 27-29, 281-282) Although the record reflects the vocational expert's opinion that polyester string cutting would be "like hand packaging...[a]nd it's pretty sedentary" (TR. 282), the hearing transcript does not reflect that the vocational expert testified that Plaintiff could in fact perform work as either a chili sorter, which she classified as light work, or the sedentary work of a string cutter.

[9]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, *a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.* To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 CFR § 416.967(b) (emphasis added).

that Plaintiff's past work as a chili sorter "as described and actually performed" was at the sedentary exertional level[10] and that Plaintiff could still perform such work.

c.      Plaintiff's past work as a string cutter

The question remains whether substantial evidence in the record supports the ALJ's finding that Plaintiff can perform her past work as a polyester string cutter.  Plaintiff was assigned to this work upon treating Dr. Padilla's recommendation that she be released to sedentary work only.  (TR. 233) Plaintiff testified that such work was performed while she was seated in the sun although she was required to move from her location from time to time. (TR. 269, 271) The vocational expert likened this work to that of a hand packager classifying it as "pretty sedentary...."  (TR. 282)

The ALJ found that Plaintiff had the ability to lift/carry ten pounds occasionally, up to ten pounds frequently, stand and/or walk at least two hours with breaks during an eight hour workday, and sit continuously with breaks every two hours for about six hours in an eight hour workday with no climbing of ladders. (TR. 28)  The ALJ's determination appears at first glance to be consistent with treating Dr. Padilla's release of Plaintiff to sedentary work.  (TR. 233; *see also* TR. 224 (Dr. Padilla indicated that Plaintiff should avoid ladders and minimize squatting)) However, Dr. Padilla never indicated time restrictions for Plaintiff's ability to sit or stand.  The examining physicians recommended various restrictions which the ALJ did not discuss in detail.  (*See* TR. 221 (Dr. Jabczenski recommended light work with no squatting, lifting or climbing ladders); TR. 243-247 (Dr. McCormick

---

[10]The *DOT*, which discusses work classifications as "generally performed", classifies "sorter, agricultural produce" work as "light." (TR. 160)  However, an ALJ is not required to make "explicit findings at step four regarding a claimant's past relevant work both as generally performed *and* actually performed." *Pinto,* 249 F.3d at 845 (emphasis in original). Here, the vocational expert's assessment of Plaintiff's description of her past work as actually performed does not deviate from the *DOT* classification.

recommended "light sedentary office work" with standing less than two hours[11] per day, unrestricted sitting alternating with standing, limitations in pushing and pulling with lower extremities, and no climbing, crawling, or crouching); TR. 251 (Dr. Chavez indicated that Plaintiff may sit an aggregate of six hours and stand and walk an aggregate of four hours with no postural limitations)).[12]   The ALJ provided no basis for his determination that Plaintiff could stand for at least two hours.   Nonetheless, such error is irrelevant to whether Plaintiff retains the capacity to perform her past work as a string cutter as she actually performed such work given that her description of that work did not require standing for up to two hours or for any other significant amount of time.

However, the fact that polyester string cutting as actually performed by Plaintiff is sedentary work that did not require standing for at least two hours does not end the analysis. Pivotal to the question whether Plaintiff can perform this work is the issue of her polyester allergy.

The Appeals Council pointed out that the ALJ's initial decision in this matter failed to address non-examining physician JLD's opinion that Plaintiff had polyester limitations. That matter was remanded for the ALJ, *inter alia,* to "[o]btain updated medical records from the claimant's treating source(s), if any, including allergy related records, if the claimant received the recommended allergist examination" and to "[g]ive consideration to the non[-

---

[11]The form Dr. McCormick completed provided several options concerning Plaintiff's capacity to stand including: "less than 2 hours in an 8-hour workday..." and "at least 2 hours in an eight hour workday" (TR. 244) Dr. McCormick chose the former over the latter.  (Id.)

[12]The ALJ's omission of several of the recommended postural limitations do not undermine his determination that Plaintiff could perform her past work as a string cutter given that Plaintiff's description of that work did not involve any of the postural positions that were restricted.   Further, the postural limitations listed do not generally affect a claimant's  ability to perform sedentary work.  *See e.g.* SSR 96-9p ("Postural limitation or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work.")

]examining source opinion pursuant to the provisions of 20 CFR [sic] 416.927(f) and Social Security Ruling 96–6p, and explain the weight given to such opinion evidence."  (TR. 137-138)

JLD indicated that Plaintiff should "avoid even moderate exposure" to "hazards." (TR. 238) When describing the "hazards to be avoided," JLD stated: "should avoid exposure to polyester due to allergy."  (Id.)   The ALJ characterized the opinion as follows: "A State agency physician reviewed the record in November 2001, and opined that claimant retains the ability to perform light work with avoidance of even moderate exposure to hazards." (TR. 26) The ALJ gave "substantial weight" to JLD's opinion "to the extent supported by and consistent with the evidence of the entire record (SSR 96-6p)."  (TR. 27) The ALJ also stated that "[i]n May 2001, claimant sought treatment for itching and rash on her hands...She was felt to have a possible allergy to polyester and was directed to use latex gloves to protect her hands from contact with polyester."  (TR. 25 *citing* TR. 217-218).

The findings and RFC assessments of state agency physicians are to be treated as expert opinion evidence from non-examining sources.  SSR 96-6p.[13]   Although ALJs are not bound by such findings, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  *Id.* Opinions of state agency physicians "can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence..., the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the [s]tate agency medical...consultant."  *Id.*  Additionally, the ALJ may also consider other factors such as the state agency consultant's specialization.  *Id.*;

---

[13]Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Quang Van Han v. Bowen,* 882 F.2d 1453, 1457 (9th Cir. 1989).

*see also* 20 CFR §416.927(f) (discussing evaluation of opinions from non-examining physicians).

The ALJ included "history of an allergy to polyester" among Plaintiff's severe medically determinable impairments. (TR. 28)   However, by not including limitations associated with polyester in Plaintiff's RFC, the ALJ in effect rejected JLD's opinion that Plaintiff should avoid even moderate exposure to that material.   The ALJ stated that he gave "substantial weight" to JLD's opinion "to the extent supported by and consistent with the evidence of the entire record."   (TR. 27)  Yet, the ALJ provided no explanation why restriction of exposure to polyester was not "supported by and consistent with the evidence of the entire record."  (TR. 27)   Nor does the record support the ALJ's omission of that restriction.  The record demonstrates that in May 2001, Plaintiff complained to her employer regarding an allergic reaction to the polyester string she was assigned to cut.  (TR. 200) She was instructed to *continue* wearing latex gloves.  (Id.)  Also in May 2001, Plaintiff presented at Arizona Family Care Associates, Inc., "complaining of being allergic to the polyester" resulting in itching and rash. (TR. 218) It was noted that Plaintiff "has been using gloves to protect her hands which are the only parts of her body that touch the polyester."  (Id.)  She was prescribed benadryl, directed to "[c]ontinue to use the [l]atex gloves," and referred to an allergist.  (Id.)  She was also given a note directing modification of her work area to "avoid contact [with] polyester and dust until seen by allergist." (TR. 217) Plaintiff testified that she did not see an allergist because insurance did not permit it.  (TR. 271-272) Her testimony was unclear as to whether the latex gloves helped avoid allergic reaction insofar as her response to that inquiry was a description of how "the thread...breaks off [sic] little pieces  from it...you're winding it around your fingers...."  (TR. 270-271)

Citing the May 9, 2001 medical records, the ALJ noted Plaintiff's complaints of polyester allergy.[14]  (TR. 25 *citing* TR. 217-218) The ALJ did not discredit this evidence. Instead he specifically found that "[t]he medical evidence establishes that the claimant has these severe, medically determinable impairments:...history of an allergy to polyester...." (TR. 28)

Information in the record concerning a polyester allergy is sparse.  Nonetheless, JLD explained the reason for his opinion that Plaintiff should avoid exposure to polyester, i.e. "due to allergy" (TR. 238), and such  opinion is consistent with and  supported by the medical evidence that was in the record before the ALJ.  (*See* TR. 217-218); *see also* 96-6p (the non-examining physician's opinion will be considered only to the extent that it is supported by other evidence in the case record). On the instant record, mere citation to the appropriate regulation and SSR and echoing repetition of same without specific reference to non-examining physician JLD's opinion that supports Plaintiff's claims do not serve as a proper explanation for the ALJ's decision to ignore JLD's recommended limitation.  *See* SSR 96-6p (the ALJ "may not ignore these opinions and must explain the weight given to the opinions in their decisions."); *cf. Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir. 1995) ("the report of a non[-]examining, nontreating physician need not be discounted when it is not contradicted by all other evidence in the record...Reports of consultative physicians called in by the [Commissioner] may serve as substantial evidence.") (citation and emphasis omitted).  The opinion has some substantiating basis and is not contradicted by any other evidence of record.  This is especially so where the ALJ specifically included "history of an

---

[14]The May 9, 2001 treatment record from Arizona Family Care Associates, Inc., references Alfred P. Wu, M.D. and Mario Moreno, N.P.  (TR. 218) That record indicates Plaintiff's possible allergy to polyester, prescription of benadryl, recommendation to continue use of latex gloves, and referral to an allergist.  (Id.)  N.P. Moreno wrote the note recommending modification of Plaintiff's work area to avoid polyester and dust.  (TR. 217) "[A] nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not."  *Gomez v. Chater,* 74 F.3d 967, 971 (9th Cir. 1996).

allergy to polyester" in his finding of Plaintiff's severe, medically determinable impairments established by the medial evidence of record.  (TR. 28) The ALJ erred in his RFC assessment by rejecting JLD's recommended limitation regarding polyester without stating legitimate reasons for doing so.  Where the ALJ has failed "to give legitimate reasons for rejecting or even mentioning those of [the non-examining physician's] conclusions that supported [the] plaintiff's disability claim," the court credits the conclusions as true.  *Castaneda v. Apfel,* 2001 WL 210175 (D. Or. 2001); *see also Regennitter v. Comm'r. of Soc. Sec.,* 166 F.3d 1294 (9th Cir. 1999) (crediting examining physician's conclusions that the ALJ improperly rejected).  Consequently, the record does not support the conclusion that Plaintiff could perform her past work as a polyester string cutter.

### d.    Plaintiff's credibility

An ALJ's RFC determination must take into account, among other evidence, Plaintiff's symptoms, including pain, that are reasonably attributed to a medically determinable impairment.  *Robbins,* 466 F.3d at 883.  "When giving such consideration, if the record establishes the existence of a medically determinable impairment that could reasonably give rise to the reported symptoms, an ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect."  *Id.* (citation omitted)*.*

It is well-settled that the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  *Orn v. Astrue,* 495 F.3d 625, 635  (9th Cir. 2007) (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing.  *Id.; Robbins,* 466 F.3d at 883. Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn,* 495 F.3d at 635 (the ALJ must

provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and  functional restrictions caused by the symptoms. *Smolen,* 80 F.3d at 1284. *See also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or on internal contradictions in that testimony.")

The ALJ found that although Plaintiff had "an underlying medically determinable impairment that could possibly produce some pain or other symptoms..." , her testimony concerning the severity and functional consequences was not fully credible.  (TR. 26-27)  To support his credibility finding, the ALJ cited residual functional capacity findings of treating and examining physicians, lack of weight loss and diffuse atrophy or muscle-wasting, and Plaintiff's daily activities.

<u>(1.)    Objective Findings</u>

"While subjective pain testimony cannot be rejected solely on the ground that it is not fully corroborated by medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and disabling effects." *Rollins v. Massanari,* 261 F3d. 853, 857 (9th Cir. 2001) (*citing* 20 CFR § 404.1529(c)(2)). *See also Reddick,* 157 F.3d at 723 ("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony merely because they are unsupported by objective medical evidence." ); SSR 96-7P ("Symptoms cannot be measured objectively through clinical or laboratory diagnostic techniques..."). Instead, "the absence of

objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence." SSR 96-7P.

Although the ALJ cannot solely rely on the objective medical evidence to discount Plaintiff's credibility, consideration of observations from physicians of record is proper. *See id.*

However, the ALJ's reference to Plaintiff's lack of weight loss, diffuse atrophy or muscle wasting does little to undermine Plaintiff's credibility. Although Dr. Jabczenski noted no sign of atrophy (TR. 220), neither he nor any physician of record indicated that atrophy or the other side effects mentioned by the ALJ would necessarily accompany Plaintiff's impairments. The Ninth Circuit has affirmed a denial of benefits where, *inter alia,* the plaintiff alleged she had to maintain a fetal position all day because of constant pain but she exhibited no physical signs including muscle atrophy of a totally incapacitated person. *Meanel v. Apfel,* 172 F.3d 1111, 1114 (9th Cir. 1999). Plaintiff's case is distinguishable from *Meanel.* Plaintiff attended physical therapy after surgery (TR. 227, 229), she attempted work first in a light capacity and then in a sedentary capacity, and she continued to walk and to attend to household chores while using a cane and walker. Arguably, these activities forestalled diffuse atrophy and/or muscle wasting. There is no basis on this record to disbelieve Plaintiff because she did not exhibit signs of diffuse atrophy or muscle wasting.

Nor should Plaintiff be disbelieved because she did not lose weight. No evidence of record supports the conclusion that Plaintiff's impairments would have resulted in weight loss. Plaintiff stated that she was less active since her knee injury. (TR. 179 ("my radius of activities [sic] greatly reduced.")) The record reflects that Plaintiff weighed 168 pounds at the time of her knee injury in June 2000. (TR. 214) In 2003, Dr. Chavez indicated that Plaintiff weighed 196 pounds. (TR. 249) Dr. Chavez noted: "[i]ncrease in weight about 20 pounds." (Id.) Further, the ALJ included obesity in his findings of Plaintiff's severe

impairments established by the medical evidence.   (TR. 28) Just as the ALJ has used Plaintiff's lack of weight loss to undermine her pain testimony, so could Plaintiff's twenty-pound weight gain since her injury and/or obesity be attributed to inactivity caused by pain resulting from her knee injury and arthritis.   The record simply does not support either conclusion.   Consequently, the ALJ's reliance on lack of weight loss to discredit Plaintiff's credibility was in error.

(2.)    Plaintiff's Activities

The ALJ cited Plaintiff's statements that she is able to "cook, shop, do laundry, wash dishes; is able to get out and take walks, visit friends/relatives, talk on the phone, and requires no assistance in dressing or in personal grooming." (TR. 27) He pointed out that "a considerable amount of time is spent watching television and/or reading." (Id.) Consequently, the ALJ "inferred that [Plaintiff] has maintained a somewhat normal level of daily activity and interaction." (Id.)  He also noted that the mental and physical requirements of her household tasks and social interactions were consistent with a significant degree of overall functioning.  (Id.)

The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001) (*quoting Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)); *see also Vick v. Comm'r of  Soc. Sec.,* 57 F.Supp.2d 1077, 1086 (D. Or. 1999) ("If a claimant's activity is in harmony with her disability, the activity does not necessarily indicate an ability to work.") "Engaging in activities including household chores is not necessarily inconsistent with a finding of disability." *Vick,* 57 F.Supp.2d at 1085. The question is whether the plaintiff spends a "'*substantial* part of his [or her] day engaged in pursuits involving the performance of physical functions that are transferrable to a work setting...' Thus, if a claimant is capable of performing activities including household chores, 'that

- 30 -

involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.'" *Id.* at 1085-1086 (*quoting Fair,* 885 F.2d at 603) (emphasis in original). *See also Rollins,* 261 F.3d at 857 (affirming ALJ's finding that fibromyalgia plaintiff's allegations of disabling pain were undermined by activities such as attending to the needs of two young children, cooking, housekeeping, laundry and leaving the house daily to go to her son's school and after school activities, doctor's appointments and the grocery store).  However, certain activities such as swimming or limited walking "are not necessarily transferrable to the work setting with regard to the impact of pain.  A patient may do these activities *despite* pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or engage in similar activity for a longer period given the pain involved." *Vertigan,* 260 F.3d at 1050 (emphasis in original). *See also Fair,* 885 F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the work place....").

The ALJ's findings that Plaintiff is able to shop, take walks, and that a considerable amount of time is spent watching television and/or reading have no support in the record. Plaintiff testified and stated in her activities of daily living questionnaire that she did not go shopping anymore.  (TR. 178, 296-297 ) Instead, she waited in the car while her husband shopped because parking spaces were too far from the store and store aisles were not wide enough for her walker or cane.  (Id.)  There are no statements from Plaintiff that she watches television or takes walks other than out to her patio to rest while doing household chores. (TR. 296) Although her hobbies include at-home study of English and citizenship, there is no indication in the record that Plaintiff, who has an elementary education and who does not speak or read English, spends a considerable part of her day reading.  (TR. 179)

The ALJ properly considered Plaintiff's daily activities that were supported by the record. "[I]f a claimant is able to spend a substantial part of his [or her] day engaged in pursuits involving the performance of physical functions that are transferable to a work

setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Fair,* 885 F.2d at 603.  The ALJ found that Plaintiff had the ability to perform sedentary work with certain limitations.  (TR. 28)  Plaintiff indicated that she was able to take care of her personal needs, perform  household chores, including meal preparation, with breaks from standing, and drive although she preferred not to. "An ability to perform such activities may be seen as inconsistent with the presence of a condition which could preclude all work activity", especially the sedentary activity consistent with Plaintiff's past work as a string cutter.  *Curry v. Sullivan,* 925 F.2d 1127, 1130 (9th Cir. 1990).  "Where, as here, the ALJ has made a specific finding justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record,...[the Court's] role is not to second-guess that decision."  *Fair,* 885 F.2d at 604.  The ALJ's credibility determination concerning Plaintiff's activities is based in part on substantial evidence and that portion of the ALJ's determination will not be disturbed.  *See Vick,* 57 F.Supp. 2d at 1086 (ALJ's reliance on evidence regarding a claimant's activities is consistent with SSR 96-6p and Ninth Circuit case law).

### 2.      Bias and Constitutional Claims

Plaintiff contends that the ALJ  was biased against her.  She also cites  constitutional violations during the claims process arising from an "observed marked deference toward the dominant class" and "selectiveness against the unrepresented, and logically, diversity poor." (Plaintiff's MSJ, pp. 4, 7)

"ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased.  This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification."  *Rollins,* 261 F.3d at 857-858 (*citing Verduzco v. Apfel,* 188 F.3d 1087, 1089 (9th Cir. 1999)).  To establish bias, the plaintiff must "show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'"  *Id.* (*quoting Liteky v. United States,* 510 U.S. 540, 555-556 (1994)).  Further, "'expressions of impatience, dissatisfaction, annoyance, and even

anger, that are within the bounds of what imperfect men and women...sometimes display' do not establish bias." *Id.* (*quoting Liteky,* 510 U.S. at 554-555).

Plaintiff cites the ALJ's 2002 decision as evidence of his "stereotyped view of her as an unmotivated migrant." (Plaintiff's MSJ, p.4 (emphasis omitted)).   In his 2002 decision, the ALJ stated that Plaintiff

> had a very poor and inconsistent work history, with minimal earnings for most years.   These poor earnings not only suggest that the claimant may have always lacked the motivation to work, as opposed to being physically unable to do so, but also tend to suggest that the claimant has a strong motivation to seek disability benefits, as she would be receiving more in disability benefits than she has earned in a number of years of past work.

(TR.65) He also cited Plaintiff's termination for insubordination and hostility as additional evidence suggesting Plaintiff's lack of motivation to work.  (TR. 66)  He stated that "[t]he fact that the claimant's work activity was discontinued for a reason other than a medically determinable impairment does not support her allegations of disability." (Id.)  The ALJ also pointed out that Plaintiff's alleged onset date of disability, August 15, 2001, was the day immediately following her August 14, 2001 termination.  (Id.)

The ALJ's statements concerning Plaintiff's inconsistent work history at most suggests his initial misunderstanding of the nature of the seasonal work of a farm laborer. However, there is no basis in the record to conclude that such misunderstanding occurred due to bias against Plaintiff.  Further, any error associated with same was rectified on remand with the vocational expert's testimony that  Plaintiff "had performed work as a chile sorter/string cutter long enough for it to be considered relevant work."   (TR. 27) Additionally, Plaintiff's termination from work and application for benefits filed soon thereafter are documented in the record.   The ALJ did not repeat these opinions in his 2004 decision issued after remand.  Nothing in either decision or the record as a whole suggests that the ALJ harbored any prejudice or bias against migrant farm workers or against Plaintiff because she was such a laborer. *See e.g. Verduzco,* 88 F.3d at 1089-1090 (no bias where the ALJ "found it hard to believe that [the plaintiff] did not speak more than a little English,

having been in the United States for thirty years..." given that "[n]othing in the record indicates that the ALJ harbored any prejudice or bias against non-English speakers, Spanish speakers in particular, or even against people who come to the United States and fail to learn English.")

Although, as set forth above, some of the ALJ's findings are not supported by substantial evidence in the record, nothing in the record supports Plaintiff's contention that the ALJ made these errors as a result of bias.   Nor is there any indication in the record that the ALJ harbored any bias against Plaintiff for any reason whatsoever.

Nor does Plaintiff sufficiently allege a due process violation.  An attack of the merits of the ALJ's decision is not sufficient to establish a constitutional violation.  *See Evans v. Chater,* 110 F.3d 1480, 1482 (9th Cir. 1997) Instead, the constitutional claim must implicate a due process right to a meaningful opportunity to be heard or to seek reconsideration of an adverse benefits determination. *Id.* at 1482-1483.  The record demonstrates that Plaintiff was not denied a meaningful opportunity to be heard in light of the fact that she was afforded two hearings during which a Spanish interpreter was made available.   The ALJ also further developed the record by referring Plaintiff for a consultative examination.  That Plaintiff made use of the process for seeking reconsideration of an adverse determination is demonstrated by her successful request for reconsideration of the initial denial of her claim (TR. 74) and her request for review of the ALJ's 2002 decision which resulted in a remand by the Appeals Council (TR. 90, 130-132, 136-140).  Plaintiff again made use of the process accorded her when she sought review of the ALJ's 2004 decision (TR. 13) and when she filed the instant action after the Appeals Council denied her 2004 request for review.

To the extent Plaintiff suggests that the claims process is "selective[] against the unrepresented and...diverse poor," (Plaintiff's MSJ, p. 7), the Ninth Circuit has held that "[l]ack of counsel does not affect the validity of the hearing unless the plaintiff can demonstrate prejudice or unfairness in the administrative proceedings." *Key v. Heckler,* 754 F.2d 1545, 1551 (9th Cal. 1985).  Plaintiff argues that her refusal of counsel led the ALJ to

deny her claim.  (Plaintiff's MSJ, p. 7) The record does not support such a finding.  It is well-settled that "[t]he ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (internal quotation marks and citation omitted).  When the plaintiff is unrepresented, the ALJ must be "especially diligent" in fulfilling this duty.  *Id.*; *see also Key,* 745 F.2d at 1551.  The ALJ questioned Plaintiff to clarify her job duties, referred to a vocational expert to classify same, and further developed the record by sending Plaintiff for a consultative examination.  As discussed *supra* at pp. 32-34, Plaintiff has not shown that the ALJ was biased against her.  Further, although some of the ALJ's findings were in error, the record does not support the conclusion that the ALJ's errors were deliberately intended or otherwise the result of animus directed toward Plaintiff.  On the instant record, Plaintiff has not demonstrated prejudice or unfairness.  Plaintiff's claims of bias and constitutional violations are unsubstantiated and meritless.  *See Hoye v. Sullivan,* 985 F.2d 990, 992 (9th Cir. 1993) (*quoting Boettcher v. Secretary,* 759 F.2d 719, 722 (9th Cir. 1985)) ("A constitutional claim is not 'colorable' if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or...is wholly insubstantial or frivolous.")

## V.    CONCLUSION

Plaintiff requests that the Court remand the matter for an immediate award of benefits.  Remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart ,* 379 F.3d 587,  593 (9th Cir. 2004) (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits."  *Id*. (citations omitted); *see also Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995).

As discussed above, the ALJ failed to set forth legally sufficient reasons for finding that Plaintiff could perform her past work as a chili sorter and for rejecting the non-examining physician's opinion that Plaintiff should avoid exposure to polyester which directly impacts Plaintiff's past work as a polyester string cutter.  Therefore, the record supports the conclusion that Plaintiff cannot perform her past relevant work identified by the ALJ.   When the claimant cannot perform past relevant work, "the burden shifts to the [Commissioner] to identify other jobs that the claimant is capable of performing...In doing so, the [Commissioner] must take into account the claimant's residual functional capacity, as well as her age, education[15] and last fifteen years of work experience."  *Terry v. Sullivan,* 903 F.2d 1273, 1275 (9th Cir. 1990) (applying 20 CFR § 404.1563 which is identical to 20 CFR § 416.963, the regulation applicable in the instant case)  Applicable regulations provide that when the claimant has reached an advanced age of fifty-five or over, as is the case herein given that Plaintiff was born in 1950, and has severe impairments that limit her to sedentary or light work, "we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work (or you have recently completed education which provides for direct entry into skilled work that you can do despite your impairments."  20 CFR § 416.968(d)(4).[16]  In a case such as Plaintiff's, "we will find

---

[15]"The term *education* includes "how well [the claimant is] able to communicate in English since this ability is often acquired or improved by education."  20 CFR §416.964(b).  In evaluating educational level, the Commissioner uses the following categories: illiteracy, marginal education, limited education, high school education and above.  *Id.*  "We generally consider that formal schooling at a 6th grade level or less is a marginal education."  20 CFR §416.964(b)(2).  Generally, "limited education" means formal schooling at a 7th grade through 11th grade level.   20 CFR §416.964(b)(3).

[16]The Ninth Circuit has explained that the Commissioner "faces a more stringent burden when denying disability benefits to older claimants.  Thus, while the [Commissioner] can find younger claimants not disabled so long as they can perform unskilled work...the same is not true of claimants of advanced age (fifty-five or over)."  *Terry,* 903 F.2d at 1275.  Agency regulations consider advanced age (fifty-five or over) as the point where "age significantly affects a person's ability to adjust to other work."  20 CFR §416.963(e).  *See*

that you have skills that are transferable to skilled or semi-skilled sedentary work only if the sedentary work is so similar to your previous work that you would need to make very little, if any vocational adjustment in terms of tools, work processes, work settings, or the industry." *Id.*    The vocational expert herein testified that Plaintiff's past work as a chili sorter was unskilled work.   (TR. 281); *see also* 20 CFR § 416.968[17] (defining skill requirements).  The record does not suggest that Plaintiff's work for a few months as a string

---

*also Terry*, 903 F.2d at 1276 (recognizing that the Commissioner cannot require a skill level of so little skill that anyone could do the job because "older people are at a competitive disadvantage for such jobs.")

[17]The regulation provides the following definitions:

(a) *Unskilled work.*  Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

(b) *Semi-skilled work.* Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

(c) *Skilled work.* Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work. Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity.

20 CFR § 416.968(a)-(c).

cutter or her work as a farm laborer required more than unskilled labor.  Moreover, nothing on the record suggests that Plaintiff possesses skills that are transferable to skilled or semi-skilled work. Because Plaintiff is unskilled, she is disabled under the applicable regulations. *See* 20 CFR § 404 Subpart P, App. 2, Rule 201.01 (Table No. 1 indicating that a claimant of "advanced age" with "limited or less" education and previous unskilled work is "disabled"); 20 CFR 416.969 (section 404 Subpart P also applies to supplemental security income regulations).   It has been more than six years since Plaintiff initially applied for benefits. Plaintiff's claim has been remanded once before by the Appeals Council for the ALJ to correct defects in his 2002 decision.   It would serve no purpose to remand this action for the ALJ to attempt to identify other work for Plaintiff, who is of advanced age and approaching retirement age,[18] has performed unskilled labor in the past, and has an elementary education. *See id.*; *Terry,* 903 F.2d at 1277 n.8, 1280. The Ninth Circuit has recognized that "[r]emanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.'" *Benecke,* 379 F.3d at 595 (*quoting Varney v. Secretary of Health and Human Services,* 859 F.2d 1396, 1398 (9th Cir. 1988)); *see also Terry,* 903 F.2d at 1280 (remanding for an award of benefits where application 20 CFR 404, Subpart P, App. 2, Rule 201.01 (Table No. 1) rendered the plaintiff disabled and almost four years had passed since the plaintiff applied for benefits).

Substantial evidence of record does not support the ALJ's RFC assessment or his determination that Plaintiff is able to perform her past relevant work as a chili sorter/string cutter as she described it.   Nor can Plaintiff perform other work given her skill level, advanced age, and education. *See* 20 CFR § 416.968; 20 CFR § 404, Subpart P, App. 2, Rule

---

[18]*See* 20 CFR § 416.963(e) (defining "retirement age" as 60-64); 20 CFR § 416.968(d)(4) (discussing transferability of skills for such age).

201.01 (Table No. 1). Pursuant to the applicable regulations, Plaintiff is disabled.  *See* 20 CFR  404, Subpart P, App. 2, Rule 201.01 (Table No. 1).  No outstanding issues remain before an award of benefits may be made. Therefore, remand for further administrative proceedings "would serve no useful purpose and would unnecessarily extend [Plaintiff's] long wait for benefits." *Benecke*, 379 F.3d at 595 (declining to remand for further vocational expert testimony at step five). Therefore, Plaintiff's Motion for Summary Judgment should be granted and this matter should be remanded for an award of benefits.

## VI.    RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court:

(1)    deny Plaintiff's Motion to Submit New Evidence (Doc. No. 26)

(2)    grant Plaintiff's Motion for Summary Judgment (Doc. No. 12);

(3)    deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 23 ); and

(4)    remand this matter for an award of benefits.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number:  CV 04-538-TUC-RCC.  A party may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 27th day of September, 2007.

_____
Héctor C. Estrada
United States Magistrate Judge